I'm sorry, I couldn't hear you. That's ready for appellant. All right. Appellant, are you ready to proceed? Yes, sir. All right. You may proceed. May it please the Court and good afternoon, Your Honors. I'm going to ask Judge James Martin for an anthem. We recognize that disputes involving ERISA health care coverage denials often arise in sad and unfortunate circumstances. In this case, it's certainly one of them. But as this Court's decisions reflect, the proper resolution of a benefits decision inevitably must rest on a fair reading of the ERISA health care plan and the evidence in the administrative record. But in this case — How did we get to performing medical procedures that run up a bill of several hundreds of thousands of dollars without any predetermination of coverage? In this case, Your Honor, the coverage determination was made after because the plaintiff went forward with her surgery before the plan evaluation was made. I understand that, but I guess I'm not trying to understand how that would happen. Normally, you would expect that that determination is going to be ironed out one way or another, approved or not, before you engage a very, very large liability. The hospitals are going to be hanging on to a $400,000 claim they can't afford or something or whatever it is. You would expect that, Your Honor. But in this case — I just don't understand. What happened procedurally? What happened procedurally — I think it's relevant to what happened thereafter. Yes. Excuse me, Your Honor, for interrupting. In this particular case, the preauthorization forms were completed by the surgeons. It was submitted to the plan administrator for review. And the surgery went forward before the plan administrator completed its review. That was not something that the plan was involved in or interceded in or was given an opportunity to do anything about. So at the point that the plan evaluation was completed after the surgery and timely after the surgery, within five days, the denial of coverage was made. That denial of coverage was provided for under the plan, under an exclusion in the plan, that was very clear that it didn't extend to bariatric weight loss surgery. Part of the reason I ask the question is that one of the things that you ultimately pointed to, the denying coverage here, was the note that the physician made at the outset, a note of no nausea. In other words, it's one thing when you go into the doctor and he's making notes as to what your present condition is, you're not having nausea or whatever. It's something else when you're looking at the question of what ultimately became the large question here of whether or not this was within the exception of the exclusion. Well, let's step back and take a look at that, Your Honor, because that also goes to the fact that when you look at the medical records here, this surgery never would have been approved because it was bariatric surgery for weight loss. If you look at the records and the intake, which was prepared by Dr. Davis, who was the surgeon, it lays out a weight loss plan, and in that plan there is no reference anywhere to a condition of excessive nausea and vomiting as a reason to have the surgery. From start to finish, the analysis is about weight gain, about a prior bariatric surgery that needed to be corrected. The diagnosis by the attending physician here, the surgeon, was that there was this, I don't know the medical term for it, but the esophageal difficulty, et cetera, which was extraneous to the – I thought that's what it was. So two things on that, Your Honor. The only diagnosis in the pre-surgery plan was for morbid obesity. There was a reference to GERD in the plan, but GERD, weight loss surgery to take care of GERD, is not covered under the plan. It's not within the terms of the exception. The plan doesn't cover weight loss to treat GERD. What does the plan cover? In other words, what is the exception to the exclusion? The exception to the exclusion is confined to condition of excessive nausea and vomiting, and that never appears in the pre-surgical medical records. It's never appeared in any medical record. But how does that occur without some underlying attending condition? You just – the only thing wrong with you – nothing's wrong with you except you just throw up all the time. Well, yes, Your Honor, but GERD as a condition doesn't mean that you have excessive nausea and vomiting. GERD can mean heartburn. That's the thrust of my question, and I'm not challenging what you're saying. I'm trying to understand the relationship of GERD and nausea, et cetera. So there would only be a relationship between GERD and excessive nausea and vomiting if the medical records provided that connection and said that's a condition of this surgery. In this case, in the pre-surgical records and in the medical records from start to finish, there is no indication that this surgery was intended to treat the condition of excessive nausea and vomiting. The plan exclusion says, Your Honor, that if the weight loss surgery is performed for any other purpose except for the condition in the exception, which is clear, it's excluded. And it goes to great pains to say that. Now, as far as excessive nausea and vomiting is concerned, in this particular case, it only made its way into the analysis in a letter from the treating surgeon after the fact at the second-level appeal. And the issue here is, did the plan have to take that declaration as dispositive You argue that the first-level appeal was not inconsequential, but you actually hear that it only came in in the second. Well, they are arguing that the first-level appeal was not consequential. We certainly argue that the first-level appeal was substantive and was the one that was correctly provided for under the plan. The issue for this Court is, under the abuse of discretion standard, did Anthem have to credit that subsequent statement in the letter at the expense of what was provided for in the medical records? And this Court has many times answered that and said no. I understand what you're saying. You're saying that the doctor's statement came in only in the second appeal, and that is relevant to this determination. In other words, the first appeal is a defaulting consequence to it. Let me back up on that, Your Honor. The letter came in at the first appeal, and it was at the first appeal. It was also part of the second appeal. Right. Okay. But the — but for purposes of the abuse of discretion analysis and the substantial evidence in the record, the plan was entitled to make a choice between what was referenced and rationally connected to the surgical records, which did not refer to excessive nausea and vomiting, at the expense of what the treater had to say after the fact and after the benefits decision had been made. This Court has seven or eight cases that have walked down this analysis and said they need not credit the treating physician at the expense of what the records provide. It said that in Gothard. It said it in Burrell. It said it in Anderson. What does the plan provide for instructions for the first appeal? So the first appeal required a writing, but the plan took the e-mail that was sent that initiated the appeal and allowed the appeal to go forward on that basis and advised the plaintiff that they — Does it do more — it requires writing. I'm not trying to draw a distinction between writing and e-mail at the moment. But does it have any additional instruction or advice to the patient or whoever was preparing that of what should be contained in that, or did it just say in notice or something? What does it say about that first appeal? Right. So the initial denial of benefits by Anthem, which was the plan administrator before the appeal, set forth the right to appeal and indicated to the plaintiff that material could be presented in connection with that appeal at the next level. It laid it out exactly according to the requirements in the plan. And there's no dispute in this case that that happened. The plaintiffs are only disputing the fact at the end of the day that literally a written communication from the plaintiff to the plan was not required. Your plan is saying that you may submit additional information in your — at the second level. No. It was provided for for the first level, too. And additional information was submitted. The plaintiff — No, I'm sorry. The plan says that you may submit additional information from your written statement of appeal. I don't understand what you're saying. Additional records. Anything that you want to submit, you can put that in at the first level appeal. Additional records than what is already in the medical records. Yes. And there were no constraints put on the plaintiff's ability to do that. The trial court — They don't complain if there's something they wanted admitted that wasn't admitted or considered, do they? That's correct. And by the second level appeal, of course, all of that was before the reviewers who confirmed the decision and the initial denial. At the second level appeal, would Anthem submit evidence there? I'm unclear — Yes. — reviewing the underlying material, but — The answer to that question is, at the second level appeal, Anthem considered the medical records that provided for the surgery. It was not obligated, Your Honor, under this Court's authority to submit any evidence of its own. It didn't have to consult an expert. The issue for the Court was, is there a rational connection between the decision made by the plan administrators, that is, that there's no indication of excessive nausea and vomiting, and that this was a weight-loss surgery, versus any evidence of that? And here — What's the relationship in — because I — obviously I'm up here as a judge and not a medical professional, but the relationship between gastroesophageal reflux and excessive nausea-slash-vomiting. Is there some kind of Venn diagram overlap? If you have one, you necessarily have the other. Is there no overlap, and they're completely separate? How coterminous are they? So, the answer is, they are not coterminous, to start there. If you have GERD, it does not mean, of necessity, that there is excessive nausea and vomiting. GERD has many symptoms attached to it, heartburn being the most prevalent. So, if you see a diagnosis of GERD in a medical record, that isn't going to tell you that there was excessive nausea and vomiting. Now, is it possible to have GERD and excessive nausea and vomiting? Yes, but the problem here is, the record breaks down on that very point. There is no connection made in the medical records in this case between any reference to GERD and the condition of excessive nausea and vomiting. But the exception is phrased as treating a nausea. Is that correct? No. Your Honor, the exception is phrased for treating the condition of excessive nausea and vomiting. And, again, what we're looking for here is not the most persuasive evidence on all of this. But if it's a – if you're treating the nausea that is produced by GERD, it's not included. Yes. I mean, weight loss surgery to treat GERD and nausea associated with GERD would not meet the literal terms of the exception. But even there, Your Honor, there is no indication in these medical records that the GERD we're referred to was connected to nausea or vomiting. And the only thing – I wasn't so clear that GERD was connected to the weight, necessarily. GERD was a condition that the plaintiff apparently had, according to the records. But it can come with obesity. It can – they can be together. But there was no article submitted, no evidence submitted, no testimony submitted that said the reference to GERD in these records is equatable with excessive nausea and vomiting under the plan, or the plaintiff had the kind of excessive nausea and vomiting connected to her GERD that could have triggered the exception. When the plan administrators looked at that and didn't see those references, they were entitled to conclude that it was rational that the surgery was for the purpose stated, which was weight loss, and not to treat the condition of excessive nausea and vomiting. That's a straightforward abuse of discretion analysis. Surgery was for weight loss, and that's based on the doctor's note that the patient was obese. The pre-surgical report at 1740 to 1743 of this record is unambiguous that this was weight loss surgery for morbid obesity. It is based on that report. I understand. But the source of that is the doctor's notations. The source of it is the typed-out report signed by the doctor, yes. Yes. And his notation in that report, as it related to nausea and vomiting, said no. That's what he relied upon in the first appeal. That's in the medical records, which were relied on in both appeals, Your Honor. I understand, but the first appeal as well. Thank you, counsel. Mr. Weill? Weill, Your Honor. Weill? Nicholas Weill. All right. Here on behalf of Nicholas Weill of Harbath Law Group, representing Plaintiff Appley, Cross Appellant Karen A. Rittinger, and I'm appearing with Managing Attorney Dan Harbath, and may it please the Court. The Employee Benefit Security Administration has a website and a history of ERISA. I won't read the whole thing to you, but I'll read you the first sentence of their history of ERISA. The goal of Title I of ERISA is to protect the interests of participants and their beneficiaries in employee benefit plans. That's not just a webmaster at the Labor Department who says that. That's paraphrasing Section 2 of ERISA. That's statutory language, congressional findings, right at the start of ERISA, right under the short title that ERISA was enacted, quote, to ensure the equitable character of such plans. Now, I'm going to get into our cross appeal from the disposition, the district court's disposition in a few minutes, but first let's review the ERISA full and fair rule, Section 503.2, I believe, the full and fair rule, which Anthem contravened by not acknowledging and applying its own excessive nausea-vomiting language, not treatment of the condition of nausea-vomiting. The language says excessive nausea-vomiting in its own health certificate that it, or presumably its associates, drafted. I'd like to underscore Anthem's language from its own denial, both the initial denial of Mrs. Ridinger's claim and the putative first review, the disposition of the email to Kathy, whoever that is. In both of these, Anthem sent to Mrs. Ridinger a document that conclusively, categorically stated that our plan doesn't cover weight loss surgery or bariatric surgery, period. No mention of any exceptions applicable or not. I'll quote that language for you. Your contract does not provide coverage for weight loss surgery, bariatric surgery, revision bariatric surgery, hospital care, dot, dot, dot. These are all exclusions of your contract and not covered benefits, period. And both of those written decisions use that same categorical language, word for word. It's almost as if the first-level appeal, so-called first-level appeal, simply copied and pasted the earlier denial from a shared source. It calls into question the independence of the review. Nor did the review of the so-called second appeal, Mr. Harbass' appeal, say take up GERB, consider it, weigh it, reject it as not necessarily entailing excessive nausea and vomiting. Not to mention the second appeal, as you know from our briefs, nor did the so-called second appeal, Mr. the review of Mr. Harbass' appeal, regard the nausea and vomiting argument that Mr. Harbass raised, let alone the evidence that he attached. They're both obvious in Mr. Harbass' appeal from the first page. No straight-faced disposition of the so-called second appeal could admit discussion of that exception. It's — No, go ahead. Well, it's not a misstatement of what the policy does, is it, for them to say it doesn't cover weight loss surgery? That doesn't misstate what the policy says, does it? I partly disagree, Your Honor. Your complaint is just that they didn't get into the exception. Is that what your complaint is? They didn't consider the exception to what the policy says. That would have been a good start, Your Honor. All right. But it's not a misstatement to say it didn't cover weight loss surgery. As it's stated categorically in the letter to Mrs. Redinger, yes, Your Honor, it's inadequate notice. If I'm — If the stated purpose for her surgery was to lose weight and their policy says we don't pay for surgery that's designed to accomplish loss of weight, they told her what they needed to tell her about what she submitted. Your Honor, the first — your first preface isn't supported by the record, though, that Mrs. Redinger's surgery — Mrs. Redinger's surgery was to alleviate her excessive nausea and vomiting. That's supported by the record, supported by Mr. Harvath's appeal. To weigh it and reject it is one thing, but we didn't get that far because there's no acknowledgement of the exception to begin with. Mr. Harvath, I should — Mrs. Redinger, through — You start off with the fact that the physician, in his notes, writes down no nausea. He's right off the bat. And he said morbid patient, morbidity. You know, morbid weight. Excessive weight. That in and of itself, that notation made by the — which arguably — and your only reply to that that I can think of is simply that that was just the physician describing the current symptoms before him. But they happen to be right in the teeth of the exclusion. I understand. I understand the point, Your Honor. And given the morass of other conditions that are temporary, we've all been to the doctor. We've all encouraged — we've all incurred that intake process of do you have a fever now? No. Are you sick now? No. Are you vomiting right now? No. It would be bending over backwards to read that one incantation of no nausea and vomiting to refer to some sort of permanent state And to negate — again, we haven't heard this from Anthem in its reviews anyway, to take up that no nausea and vomiting bit, weigh it, and reject it. Even when you came back with a supplementation to the record, they came back with GERD. I'm sorry? I said the record was supplemented by the original physician here, but that supplementation simply referred to a treatment of GERD, not freestanding nausea, et cetera. And we just went through the discussion about the reach of GERD and the nausea and so forth. Well, the record axiomatically — assuming arguendo that GERD was brought up and given full and fair review, which is absolutely not supported by the facts in my view. GERD axiomatically entails nausea and vomiting, and that's supported by the record. Reflex is always unwelcome and excessive for the patient who's experiencing it. The record has declarations of Mrs. Rittinger excusing herself at meals. But you don't dispute that a person could have GERD and not experience nausea and vomiting? The articles and the academic articles do dispute that, Your Honor. So every person who has GERD experiences nausea and vomiting? Is that your position? I can't take that position for sure, but I can take the position that Mrs. Rittinger did, and that's supported by the record. The — and quickly, note that there's a public policy concern here, too, that Anthem's contravention of the full and fair rule, the next person who comes along and is not given adequate notice, that's in this ERISA section 503 sense, the next person who comes along is a layperson without the long experience with insurers that Mrs. Rittinger unfortunately has, will be chilled by this decisive categorical language. Like I said before, we do not cover bariatrics and weight loss into not bothering to appeal, sticking up for their own entitlement to coverage. Well, I guess the insurer knows better than I do whether I'm covered. They say they don't cover weight loss, so they don't cover weight loss. I'm not going to bother hiring a lawyer and going through a fight to — Was it an emergency surgery? Mr. Harbath might be able to address that more in his remarks. And I guess I ask that because it provides a process where you can get a preauthorization in terms of whether or not they will cover a procedure. Obviously, if it's an emergency, you don't have time to fill out forms and wait to hear back, but that's why I asked whether or not it was an emergency. If you don't know the answer, don't worry about it. I have to say I don't know, and I don't know of it being in the record. I don't know is a good answer. Sorry, Your Honor? I don't know. Sometimes it's a good answer. My favorite friend here is the record. I think that's the favorite friend of this, the best friend of this simple case, Your Honors. Finally, let me get into the disposition, the district court's disposition. Why are we cross-appealing when Mrs. Roeninger won? Yes, she won. The district court certainly won, established her entitlement to past and future benefits. To use the district court's phrase, her resulting care. The district court certainly acknowledged the prayer for past and future damages in her complaint. And three, the district court acknowledged that ERISA explicitly enables a right of action for due and future benefits. But Judge Ellison didn't finish the job. Rule 54C requires that the district court, quote, grant the relief that the parties and asylums do. So the district court didn't enunciate the unrebutted dollar amount of actual damages, nor futures. So what particular judgment, what disposition would we like to see from this court? Mrs. Roeninger seeks a remand with instructions to the district court, consonant with Rule 54C, to grant the relief to which she's entitled, to add to the conclusion section of its September 14, 2017 memorandum in order. By rewarding dollar amounts, the unrebutted actual damages dollar amount of, as it stood in the unrebutted exhibit, $798,518, plus future proceedings to elucidate and grant the benefits from, as the district court phrased it, her resulting care. I mean, the district court asked you to submit a motion in connection with that, didn't it? Yes, Your Honor. And that motion never got submitted, I guess, because you appealed. Exactly, Your Honor. We were left in a bit of un-clarity, of in-clarity, and we're preparing such a . . . And so what we're left with is not a final judgment from the district court on that issue then, isn't it? Isn't that what we're left with? Both parties . . . I'm trying to answer your question straightforwardly. Both parties agreed that the judgment was final for appeal . . . the memo in order was final for appeal purposes procedurally by operation of the lapsing of time. But we're not done. We're not done here. We . . . Mrs. Reidinger was awarded her entitlement to damages, but not a dollar amount. And so, that's why further proceedings are necessary. And, if there are no other questions, I will take a seat. Thank you very much. Thank you, Counsel. Rebuttal. Just a few quick points, Your Honors. On the notion of the policy issue that is overarching in this case, ERISA protects only contract benefits. That's the ultimate goal of the statute. Nothing more. The Supreme Court said that in Black and Decker. It said it in Firestone. So, if there's no coverage under the plan, there is no policy of ERISA that requires an expansive construction here to reach a different result. There's also no requirement under ERISA that benefit eligibility determinations made by plan administrators or reviewers reflect a weighing of the evidence. All they have to reflect is the decision and determination that was made. And, at all levels in this case, the plaintiff was advised of that specifically. The explanation was about the exclusion, referred to the exclusion. And, by the same token, the case law makes it clear that there's no heightened burden to go beyond that, even where opinions from treating physicians are involved. The Supreme Court in Black and Decker said no to that. This Court has said the same thing in its Holland and Vircher cases, among others. On the point about the evidence in the record as to the connection between GERD and excessive nausea and vomiting, it's not in the medical records. And it's not in any of the articles that the plaintiff submitted, either. What those articles talked about was the fact that bariatric surgery could be used to treat obesity and GERD. But none of those articles made a factual connection that vomiting and nausea, excessive vomiting and nausea, were necessarily symptoms of GERD. That wasn't what the articles were directed to. I'm having some difficulty with understanding the reach of the exclusion. Because nausea and vomiting doesn't sound like an illness as such. It sounds like a symptom of something else. When you look at the underlying symptoms, it may be symptomatic of obesity. It may be symptomatic of a host of other illnesses. Let's stick with what we know on that, Your Honor, as it relates to the medical records which would be relevant to the determination on the abuse of discretion. The plan did code separately for nausea and vomiting and nausea. There were procedural codes for that. They weren't used. The only code that was used was for morbid obesity. The original physician didn't code that. He not only didn't. He said no nausea and vomiting. And lastly, no medical record has been submitted that makes that connection. And it was rational for the plan administrators to draw that conclusion. Other conclusions potentially. So nausea and vomiting is a condition that however to be treated would be covered. We would expect the medical records to reflect that condition as a necessary reason that the surgery was conducted. We have a three-page surgical report here that contains no such reference. To put it another way, if the determination was that she needed the bariatric surgery in order to treat a condition or to treat nausea and vomiting, that would have been covered. Yes. Excessive nausea and vomiting, yes. But that's what we don't have, and it's not rationally connected to the medical record. If you had GERD, you wouldn't be covered for that either. That's correct. The plan doesn't cover for weight loss and GERD. It doesn't cover for weight loss and reflex. In fact, it expressly says weight loss surgery performed for any purpose is a no. Only the express condition in the exception for excessive nausea and vomiting creates a difference, and that's not reflected in the records here. The other point to make on this damages issue is it has never been vetted. In that exhibit or otherwise, there is no basis in this record to make an uncontradicted award of damages. The plaintiff sought full coverage. She was awarded full coverage. Nowhere in the summary judgment proceedings were any damages, any briefing done, and there's no basis to do any fact-finding on that for the first time on this appeal. So unless the court has further questions, we would submit. All right. Thank you, counsel. The court will take this matter under advisement. We call the next case on page 3.